UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | DOCKET NO. 5:21-cr-31 |
| ) | |
| v. ) | **FACTUAL BASIS** |
| ) | |
| MICHAEL R. GUZMAN ) | |

NOW COMES the United States of America, , by and through William T. Stetzer, Acting United States Attorney for the Western District of North Carolina, and hereby files this Factual Basis in support of the plea agreement filed simultaneously in this matter.

This Factual Basis is filed pursuant to Local Criminal Rule 11.2 and does not attempt to set forth all of the facts known to the United States at this time. By their signatures below, the parties expressly agree that there is a factual basis for the guilty plea(s) that the defendant will tender pursuant to the plea agreement, and that the facts set forth in this Factual Basis are sufficient to establish all of the elements of the crime(s). The parties agree not to object to or otherwise contradict the facts set forth in this Factual Basis.

Upon acceptance of the plea, the United States will submit to the Probation Office a "Statement of Relevant Conduct" pursuant to Local Criminal Rule 32.4. The defendant may submit (but is not required to submit) a response to the Government's "Statement of Relevant Conduct" within seven days of its submission. The parties understand and agree that this Factual Basis does not necessarily represent all conduct relevant to sentencing. The parties agree that they have the right to object to facts set forth in the presentence report that are not contained in this Factual Basis. Either party may present to the Court additional relevant facts that do not contradict facts set forth in this Factual Basis.

1. From at least as early as June 2019 through in or about May 2020 in the Western District of North Carolina and elsewhere, Michael R. Guzman ("GUZMAN") executed a scheme to defraud his employer, Victim Company A, by improperly orchestrating the sale of Victim Company A's assets through the use of shell companies he formed or caused to be formed, including Second Life Equipment LLC and All Seasons Sales and Service, and directing more than $4 million in fraudulent proceeds from those sales to bank accounts that he controlled.

**Participants and Related Entities**

2. GUZMAN, a resident of Denver, North Carolina, was employed by Victim Company A from in or about March 2008 until Victim Company A fired him on or about May 26, 2020. During the relevant timeframe, GUZMAN worked for Victim Company A as a Fleet Operations Manager, primarily out of its Fort Mill, South Carolina office. In his role as Fleet Operations Manager, GUZMAN was responsible for, among other things, the disposal of aged equipment, also known as assets.

3. "ERIC DIXON" is a name that GUZMAN used to help perpetuate the fraudulent scheme.

4. Victim Company A is a large equipment rental company that rents out on-road and off-road machinery for construction and other purposes. Victim Company A's headquarters is located in Fort Mill, South Carolina.

5. Company B is an online auction house that buys and sells used heavy construction equipment. Company B has been used by Victim Company A to auction off used equipment for more than a decade. As Fleet Operations Manager, GUZMAN had used Company B as one of several auction houses to dispose of Victim Company A's aged equipment.

6. Second Life Equipment LLC ("Second Life") was a company created by GUZMAN and another individual and used in his fraudulent scheme as a purported purchaser and reseller of used equipment. GUZMAN signed the Articles of Registration for Second Life, which listed GUZMAN as the General Manager, and provided as a business address an address known to be associated with GUZMAN.

7. All Seasons Sales and Service ("All Seasons") was another company created by GUZMAN and used in the fraudulent scheme as a purported purchaser and reseller of used equipment.

8. John Brown Acquisitions or JB Acquisitions ("JB Acquisitions") was a shelf company used by GUZMAN in the summer of 2020 to launder proceeds of the fraud and to purchase assets.

## The Fraudulent Scheme

9. Between in or about July 2019 and in or about April 2020, GUZMAN arranged for approximately 398 assets of Victim Company A to be auctioned off through Company B, fraudulently representing that the assets were owned by Second Life or All Seasons, notwithstanding the fact that the majority of the assets were still owned by Victim Company A at the time they were sold.

10. GUZMAN executed the scheme as follows:

   a. After setting up the shell company, Second Life, GUZMAN requested access for Second Life to Company B's online auction sales portal. GUZMAN also caused an Application for Credit from Second Life to be submitted to Victim Company A.

   b. An individual purporting to be "DIXON" then contacted Company B, expressing an interest in a business relationship, mentioning that he knew GUZMAN, and explaining that he had equipment he was interested in selling through Company B.

   c. After contacting Company B and representing he knew GUZMAN, the individual purporting to be "DIXON" then emailed GUZMAN, stating:

   > My name is Eric Dixon and I received your contact info from my acquaintance (and [Victim Company A] employee) [P.V.L.]. I'm the

2

> General Manager at Second Life Equipment and I deal in salvage, damaged or downed machines that I will purchase as is and where is. I'm sure with a fleet size that you deal with that you may have some machines that fit the bill. Might you have anything available?
> Thanks! Eric.

Contrary to "DIXON'S" representation, Victim Company A employee P.V.L. had never heard of "DIXON."

  d. At some point, the individual purporting to be "DIXON," representing himself as General Manager for Second Life, signed a contract with Company B, authorizing Company B to sell used equipment on Second Life's behalf. Company B representatives called GUZMAN regarding "DIXON," and GUZMAN falsely confirmed to Company B that Victim Company A had sold equipment to DIXON of Second Life and that DIXON and Second Life were in good standing with Victim Company A.

  e. "DIXON" arranged to sell the assets through Company B by sending emails with accompanying asset lists to a Company B employee to have uploaded to Second Life's account on the Company B customer portal.

  f. The assets that "DIXON" falsely represented belonged to Second Life were then inspected by Company B and ultimately sold by Company B through Ebay auction platforms.

  g. In truth and fact, GUZMAN was reselling the assets through his shell company, causing the proceeds of those sales to be sent to an account over which he and another individual exercised control and keeping the proceeds for himself.

  11. GUZMAN hid the scheme from Victim Company A by manipulating internal company records to hide the sales of assets through his shell company, Second Life, including by, for example:

  a. Manipulating serial numbers for certain assets in Victim Company A's system to make it appear that the assets had previously been sold by Victim Company A, when, in truth and fact, the vast majority of the assets auctioned by Company B still belonged to Victim Company A;

  b. Manipulating Victim Company A's records to make it appear that certain assets had been disposed of or "junked," *i.e.*, written-off the books, when, in truth and fact, the vast majority of the assets auctioned off by Company B had not been junked and still belonged to Victim Company A; and/or

  c. Manipulating credit remittances from equipment manufacturers and trade package partners, by adding or dropping assets from spreadsheets, while ensuring the dollar value remained the same, so that, while the assets listed might be different, the credit shown would match if someone looked at the dollar amount.

12. In total, GUZMAN defrauded Victim Company A out of more than $4 million through the fraudulent sales of approximately 398 assets, arranging for the fraudulent proceeds to be transferred to a bank account in the name of Second Life, which he and another individual controlled.

### Discovery of the Fraudulent Scheme and Attempted Cover-Up

13. When GUZMAN'S scheme came to light during Victim Company A's end of the year review in May 2020, Victim Company A asked him to come in for a meeting.

14. GUZMAN declined to attend the meeting. Instead, he traveled to Florida, where he visited various locations of Victim Company A, identifying himself as multiple different employees of Victim Company A, logging into Victim Company A's computer system, and seeking to review documentation.

15. On or about May 26, 2020, Victim Company A terminated Guzman's employment.

16. On or about May 27, 2020, GUZMAN transferred, withdrew, or caused to be transferred or withdrawn, all of the money remaining in the Second Life bank account to which he had initially transferred the fraudulent proceeds, leaving a zero balance.

17. On or about June 8, 2020, the phone number used by GUZMAN and another individual and purportedly associated with "DIXON" was terminated.

### Money Laundering

18. Between September 2019 and November 2020, GUZMAN engaged in multiple financial transactions greater than $10,000 derived from the proceeds of his fraudulent scheme and involving interstate commerce. For example,

    a. On or about August 28, 2019, GUZMAN purchased of a condo in Little River, South Carolina, for $170,000;

    b. On or about September 24, 2019, GUZMAN purchased a 2014 Sailfish 275 DC boat along with a 2019 Magic Tilt TXP2886B2 Trailer for $90,945;

    c. On or about October 15, 2019, GUZMAN purchased a plot of land in Lyme, New York, for $53,800;

    d. On or about April 4, 2020, GUZMAN purchased a 2020 Chevrolet Equinox for $30,919.50;

    e. On or about September 15, 2020, GUZMAN purchased a 2013 Chevrolet Silverado for $17,950;

    f. On or about September 18, 2020, GUZMAN purchased a 2020 Cadillac XT4 for $38,141;

4

g. On or about October 24, 2020, GUZMAN purchased a 2020 Heartland Bighorn Traveler for $50,015; and

h. On or about November 19, 2020, GUZMAN purchased a 2019 Chevrolet Silverado for $44,617.46

19. The loss that was reasonably foreseeable to Defendant, pursuant to U.S.S.G. § 2B1.1, was between $3,500,000 and $9,500,000.

WILLIAM T. STETZER
ACTING UNITED STATES ATTORNEY

_____
Maria K. Vento
ASSISTANT UNITED STATES ATTORNEY

Defendant's Counsel's Signature and Acknowledgment

I have read this Factual Basis, the Bill of Information, and the plea agreement in this case, and have discussed them with the defendant. Based on those discussions, I am satisfied that the defendant understands the Factual Basis, the Bill of Information, and the plea agreement. I hereby certify that the defendant does not dispute this Factual Basis.

_____    DATED: 05.13.21
Nick Oberheiden, Attorney for Defendant